UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FIRSTFACE CO., LTD., <br><br> Plaintiff, <br><br> v. <br><br> APPLE, INC., <br><br> Defendant. | Case No. 3:18-cv-02245-JD <br><br> **CLAIM CONSTRUCTION ORDER** <br><br> Re: Dkt. No. 61 |

The parties in this patent infringement action seek construction of eight phrases from the asserted claims in U.S. Patent No. 9,633,373 (the '373 patent) and U.S. Patent No. 9,779,419 (the '419 patent).[1] The Court received full briefing from the parties and held a technology tutorial. During the technology tutorial, defendant Apple made a comment to the effect that plaintiff Firstface had asserted inconsistent construction positions before the Patent Trial and Appeal Board. The Court invited each side to file a ten-page supplemental brief on the issue. Dkt. No. 118. Apple chose to file almost 900 pages of materials that ranged far beyond PTAB proceedings. Dkt. No. 123. The Court ordered this improper and massively oversized filing to be stricken from the docket, and allowed the parties to file the ten-page submissions as originally contemplated. *See* Dkt. Nos. 192 (strike order), 130 (Apple), 131 (Firstface).

---

[1] The parties' briefing on claim construction also included terms from U.S. Patent No. 8,831,557 (the '557 patent). *See, e.g.*, Dkt. No. 61. All asserted claims of the '557 patent, and some of the asserted claims of the '373 and '419 patents were found unpatentable in *inter partes* review (IPR) proceedings before the Patent Trial and Appeal Board (PTAB). Dkt. No. 106. The final written decisions of PTAB were all affirmed by the Federal Circuit. *Id*. Only claims 11-14 and 18 of the '373 patent and claims 10-13 and 15-17 of the '419 patent remain in this suit. *Id*.

## BACKGROUND

Firstface asserts claims 11-14 and 18 of the '373 patent and claims 10-13 and 15-17 of the '419 patent against Apple. Dkt. No. 1 at ¶¶24, 37; Dkt. No. 106 at 2. The '373 patent and '419 patent are both continuations of the same application and share a common specification. *See* Dkt. No. 61-3; Dkt. No. 61-4. The patents describe a mobile communication terminal and method for operating the mobile communication terminal that allows for simultaneous activation of the display screen and user authentication. Dkt. No. 61-3 at 1:17-23. The prior art required a separation of these functions, requiring that the device be activated first and then requiring a second input to authenticate the user. *Id*. at 25-49. The activation button may also be used to perform multiple functions if the button is pressed multiple times or for a longer period of time. *Id*. at 4:51-5:2. The '373 patent and '419 patent primarily differ in the specificity of their claims; the '373 patent's claims are more general with regard to their claiming of the functions of the activation button while the '419 patent claims the use of fingerprint recognition and authentication specifically as a function of the activation button. *Compare* Dkt. No. 61-3 at 14:14-57 *with* Dkt. No. 61-4 at 14:15-65.

## DISCUSSION

### I.  LEGAL STANDARD

Claim construction analysis "'must begin and remain centered on the claim language itself, for that is the language the patentee has chosen to particularly point[] out and distinctly claim[] the subject matter which the patentee regards as his invention.'" *Source Vagabond Sys. Ltd. v. Hydrapak, Inc.*, 753 F.3d 1291, 1299 (Fed. Cir. 2014) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.,* 381 F.3d 1111, 1116 (Fed. Cir. 2004)). Claim terms are given their "ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc) (internal quotation omitted). "The subjective intent of the inventor when he used a particular term is of little or no probative weight in determining the scope of a claim (except as documented in the prosecution history)." *Markman v. Westview Instruments, Inc*., 52 F.3d 967, 985 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).

"Rather the focus is on the objective test of what one of ordinary skill in the art at the time of the invention would have understood the term to mean." *Markman*, 52 F.3d at 986. The parties do not dispute the definition of a person of ordinary skill in the art.

As the Federal Circuit has underscored, the "only meaning that matters in claim construction is the meaning in the context of the patent." *Trustees of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1363 (Fed. Cir. 2016). The presumption that plain and ordinary meaning can be overcome only by a patentee's express definition of a term or express disavowal of the scope of the claim has been clarified. *Id*. at 1364. A term may be redefined "by implication" when given a meaning that is ascertainable from a reading of the specification or the patent documents. *Id*. Redefinition and disavowal need not be expressly stated or called out *in haec verba*. *Id*. at 1363. "The ordinary meaning of a claim term is not the meaning of the term in the abstract," but the term's "meaning to the ordinary artisan after reading the entire patent." *Astra Zeneca AB v. Mylan Pharm. Inc.*, 19 F.4th 1325, 1330 (Fed. Cir. 2021) (quotations omitted) (quoting *Eon Corp. IP Holdings v. Silver Spring Networks*, 815 F.3d 1314, 1320 (Fed. Cir. 2016)).

With this teaching, the rule that a claim and its constituent words and phrases are interpreted in light of the intrinsic evidence flourishes anew. The touchstones are the claims themselves, the specification and, if in evidence, the prosecution history. *Phillips*, 415 F.3d at 1312-17. This intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language. *Continental Circuits LLC v. Intel Corp.*, 915 F.3d 788, 799 (Fed. Cir. 2019). The claim language can "provide substantial guidance as to the meaning of particular claim terms," both through the context in which the claim terms are used and by considering other claims in the same patent. *Phillips*, 415 F.3d at 1314. The specification is also a crucial source of information: although it is improper to read limitations from the specification into the claims, the specification is "the single best guide to the meaning of a disputed term." *Id.* at 1315 ("[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive . . .'") (internal quotations omitted); *see also Merck & Co., Inc. v. Teva Pharms. USA, Inc.*, 347 F.3d 1367, 1370 (Fed. Cir. 2003) ("[C]laims must be construed so as to be consistent with the specification . . ."). But courts may also use extrinsic evidence (*e.g.*, dictionaries,

3

treatises) to resolve the scope and meaning of a claim when circumstances warrant that. *Phillips*, 415 F.3d at 1317.

## II.     CLAIM CONSTRUCTION

### A.     "inactive state"/ "while the touch screen display is turned off" ('373 patent claims 11-12; '419 patent claims 10, 12, 16-17)

| Firstface's Proposed Construction | Apple's Proposed Construction | Court's Construction |
|---|---|---|
| "a state in which the display is turned off yet the device itself is turned on" | "state in which the display is not receiving power" | "a state in which the device is communicable but a display screen is turned off" |

The term "inactive state" is expressly defined in the shared specification of the '373 and '419 patents. "The term 'inactive state' used herein refers to a state in which the mobile communication terminal is communicable but a display screen is turned off." Dkt. No. 61-3[2] at 3:21-23. It is a core principle of claim construction that the patentee may act as his own lexicographer if the specification defines a term "with reasonably clarity, deliberateness, and precision." *Abbott Labs. v. Syntron Bioresearch, Inc.*, 334 F.3d 1343, 1354 (Fed. Cir. 2003); *see also Level Sleep LLC v. Sleep Number Corp.*, 2021 WL 2934816, at *4 (Fed. Cir. Jul. 13, 2021) (unpublished) ("[W]here a patent applicant has elected to be a lexicographer by providing an explicit definition in the specification for a claim term, the definition selected by the applicant controls.") (internal quotes omitted) (cleaned up). Despite this definition of the term in the specification, both parties offer a different proposed construction.

Firstface acknowledges the definition of "inactive state" in the specification, but relies on additional teachings from the specification to say that the inactive state requires that a state where the device is completely turned off is excluded. Dkt. No. 61 at 12. Apple says that Firstface is attempting to read-in a requirement that the device must be turned on while the display is in an inactive state. Dkt. No. 69 at 10. The specification explains that "a state in which the mobile

---

[2] The '373 patent and '419 patent share a specification. Consequently, the Court cites to just the specification of the '373 patent for claim terms and disclosures found in both the '373 and '419 patents.

4

communication terminal is completely turned off is excluded." Dkt. No. 61-3 at 3:29-31. This teaching in the specification completely contradicts Apple's position.

Even so, the Court declines to adopt Firstface's construction, which also is different from the definition provided by the specification. In *Abbott*, the Federal Circuit found that the specification's definition was not sufficiently clear because portions of the passage defining a claim term provided two alternative definitions. *Abbott*, 334 F.3d at 1355. That is not the case with "inactive state." There is nothing inconsistent between the definition that explains that "the mobile communication is communicable but a display screen is turned off," and the further clarification that excludes a state where "the mobile communication terminal is completely turned off." Dkt. No. 61-3 at 3:21-23, 3:29-31.

Apple suggests that its construction is proper based on a proposed construction of "an OFF state of the display unit," which it says should have the same construction as "inactive state." First, "OFF state" is not a claim term in the '373 and '419 patents, but a term that appeared in the '557 patent, which is no longer in this case. Apple points to statements in the prosecution history of the '557 patent, where Firstface distinguished a piece of prior art that described "switching from the OFF state of the power of the device to the ON state of the power of the device." Dkt. No. 69-10 at 8. Firstface stated to the examiner that activation related to the OFF and ON states of the display screen, not the power of the device. *Id*. This does not change the Court's view that the definition contained in the specification is the correct definition for "inactive state." The specification makes clear that while the inactive state is a reference to the state of the display screen, the mobile communication terminal is still communicable, and that the mobile communication terminal is turned on. Dkt. No. 61-3 at 3:23-31.

Consequently, the Court construes the term "inactive state" as it is defined in the specification, to mean "a state in which the device is communicable but a display screen is turned off."

5

B.  **"active state"** ('373 patent claims 11-12; '419 patent claims 10, 12-13, 16-17)

| Firstface's Proposed Construction | Apple's Proposed Construction | Court's Construction |
|---|---|---|
| "a state in which the display is turned on" | "state in which the display is receiving power" | "a state in which the display screen of the device is turned on" |

As with the term "inactive state," the term "active state" is expressly defined in the shared specification of the '373 and '419 patents. "The term 'active state' used herein refers to a state in which the display screen of the mobile communication terminal is turned on." Dkt. No. 61-3 at 3:32-34.

Firstface and Apple view the "active state" as the opposite of the "inactive state." Dkt. No. 61 at 12; Dkt. No. 69 at 12. The definition of "active state" in the specification is consistent with the parties' view that it is the opposite of the "inactive state" as defined in the specification. The "active state" is defined as the state in which the display screen is turned on, while the "inactive state" was the state in which the display screen is turned off. Dkt. No. 61-3 at 3:21-40. Aside from the parties' constructions mirroring their proposals for "inactive state," which the Court has already declined, the parties offer no reason to depart from the explicit definition in the specification for "active state." Consequently, the Court construes the term "active state" to be "a state in which the display screen of the device is turned on."

C.  **"activation button"** ('373 patent claims 11-12, 18; '419 patent claims 10, 16)

| Firstface's Proposed Construction | Apple's Proposed Construction | Court's Construction |
|---|---|---|
| "button that, while the device is on, switches the display from a state in which the display is turned off to a state in which the display is turned on." | "depressible component that activates" | "a means for switching the device from the inactive state to the active state" |

The term "activation button" is defined in the specification as a "means for switching the mobile communication terminal from the inactive state to the active state." Dkt. No. 61-3 at 4:22-24. The parties nevertheless dispute the construction of "activation button," focusing primarily on whether or not the activation button is required to be a mechanical button, or is broad enough to

6

also encompass "software-based buttons" that appear on a touch screen. *See* Dkt. No. 61 at 7-10; Dkt. No. 69 at 3-7.

Apple believes that the activation button must be a "depressible component" because the specification and claims require that the button be pressed, separate from the display, and operational while not receiving power. Dkt. No. 69 at 5. Apple says that these constraints on the activation button mean that the button must be a mechanical button, rather than a software-based button. *Id.*

The point is not well taken. Although the specification and claims make clear that the activation button is "required to be formed on a part different from that of the display unit," Dkt. No. 61-3 at 3:58-60, that requirement does not mean that the activation button can only be a mechanical button. For example, the specification explains that the activation button may include a sub-display unit, *id*. at 4:14-16, that would allow the activation button to be a software-based button. Further, to the extent that the button must be pressed, nothing in the specification suggests that only a mechanical button may be "pressed."

Apple's suggestion that the button must be operational while the mobile communication terminal is not receiving power is unsupported. Apple relies on the specification's discussion of an "ON/OFF button" to say that the activation button must be operational even when the mobile communication terminal is not receiving power. Dkt. No. 69 at 5; Dkt. No. 61-3 at 4:11-21. But the ON/OFF button described in the specification is distinct from the activation button. The ON/OFF button is described as a button that can be used to completely turn on and off the mobile communication terminal or switch it to the inactive state. Dkt. No. 61-3 at 4:11-21. While this ON/OFF button would need to be operational even when the mobile communication terminal is not receiving power, this button is also distinct from the activation button. *Id.* In contrast to the ON/OFF button, the activation button switches the mobile communication terminal from the inactive state to the active state. *Id*. at 4:22-24. Because the inactive state, as construed by the Court above, is a state when the mobile communication terminal is communicable but the display is turned off, the activation button does not need to be operational while the terminal is turned off, as Apple says.

1    Apple says that the Court should adopt its proposed construction because the claim will
2    otherwise lack written description. Dkt. No. 69 at 5-6. But "[w]here the meaning of a claim term
3    is clear," the Court will "not rewrite the claim to preserve its validity." *Hill-Rom Servs., Inc. v.
4    Stryker Corp.*, 755 F. 3d 1367, 1374 (Fed. Cir. 2014). The term "activation button" is clear from
5    the specification. There is no reason to depart from these clear disclosures to preserve the claim's
6    validity.

     Consequently, the Court construes the term "activation button" to mean "a means for switching the device from the inactive state to the active state."

**D.      "pressing of the activation button"/ "an activation button for pressing" ('373 patent claims 11-12, 18; '419 patent claims 10, 16)**

| Firstface's Proposed Construction | Apple's Proposed Construction | Court's Construction |
|---|---|---|
| Plain and ordinary meaning | "moving the activation button in response to pressure"/ "an activation button for moving in response to pressure" | Plain and ordinary meaning |

Apple's construction of "pressing of the activation button" is part and parcel of the effort to require that the activation button be a mechanical button. Apple's primary concern is that the claims "recite pressing -- not just touching -- the button." Dkt. No. 69 at 4. Apple points to no evidence from the specification to support its proposed construction that "pressing" requires "moving in response to pressure," instead relying on dictionary definitions. *Id*. at 5. "In the absence of an express intent to impart a novel meaning to claim terms, an inventor's claim terms take on their ordinary meaning." *Starhome GmbH v. AT & T Mobility LLC*, 743 F.3d 849, 857 (Fed. Cir. 2014) (quoting *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002)).

Nothing in the specification suggests that the patentee intended to impart a special meaning to "pressing" or that the term is not readily understood by a person of ordinary skill in the art. *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1367-68 (Fed. Cir. 2012). The Court concludes that "pressing" should be given its plain and ordinary meaning.

8

### E. "fingerprint recognition" ('419 patent claim 10)

| Firstface's Proposed Construction | Apple's Proposed Construction | Court's Construction |
| --- | --- | --- |
| Plain and ordinary meaning | "process whereby a detected fingerprint is compared with a pre-stored fingerprint" | "process whereby a detected fingerprint is compared with a pre-stored fingerprint, including detecting and extracting a fingerprint" |

The parties' dispute over the term "fingerprint recognition" focuses on whether the term is limited to comparing a detected fingerprint with a pre-stored fingerprint, or whether it also encapsulates the detection and extraction of the fingerprint. Apple says that "fingerprint recognition" is a single step of comparing a detected fingerprint to a pre-stored fingerprint, Dkt. No. 69 at 16-17, while Firstface says that fingerprint recognition includes not just this comparison step but also the steps of detecting and extracting a fingerprint, Dkt. No. 76 at 10-11. Within the context of the specification, the Court finds fingerprint recognition is not limited to solely the comparison of a detected fingerprint to a pre-stored fingerprint.

To start, common sense indicates that fingerprint recognition must include the steps of detecting and extracting a fingerprint. To compare a detected fingerprint to a pre-stored fingerprint, the device must have some means for detecting and extracting the fingerprint. This common-sense understanding is confirmed by the specification. While the specification does not describe fingerprint recognition in any detail, it does describe iris recognition and states that fingerprint recognition may be a substitute for iris recognition. Dkt. No. 61-4 at 7:14-8:20. The description of iris recognition makes clear that before the a detected iris can be compared to pre-stored iris information, the user's iris must first be detected and extracted. *Id*. at 7:38-46. This is equally true for fingerprint recognition.

The language of the claims provide additional support for this understanding of "fingerprint recognition." The claims recite fingerprint recognition, but not separate fingerprint detection and extraction steps. *See, e.g.*, *id*. at 14:15-65. In the absence of recited detection and extraction steps, and because the comparison of a detected fingerprint to a pre-stored fingerprint necessarily requires that a fingerprint first be detected and extracted, those steps must be included in the meaning of the term "fingerprint recognition."

9

1    In the supplemental briefing, Apple says that Firstface distinguished the prior art before the
2    PTAB as involving a multi-step process as opposed to the one-step process in the challenged
3    claims. Dkt. No. 130 at 4. The record, however, indicates that Firstface's position before the
4    PTAB was that the prior art required multiple inputs to both activate the device and perform
5    fingerprint recognition, while Firstface's invention required only one input. *Id*. at 4; *see also* Dkt.
6    No. 131 at 3.

Consequently, the Court construes "fingerprint recognition" to mean "process whereby a detected fingerprint is compared with a pre-stored fingerprint, including the steps of detecting and extracting a fingerprint."

F.   **"fingerprint authentication" ('373 patent claims 11, 13-14, 18; '419 patent claims 10, 12, 15, 17)**

| Firstface's Proposed Construction | Apple's Proposed Construction | Court's Construction |
|---|---|---|
| Plain and ordinary meaning | "process whereby current user is authenticated as a true user if the two fingerprints match" | "process whereby current user is authenticated as a true user if the two fingerprints match" |

As with "fingerprint recognition," the dispute over the term "fingerprint authentication" is centered on whether "fingerprint authentication" is limited to just authenticating a current user as a true user if two fingerprints match, Dkt. No. 69 at 16-17, or if it also encompasses the steps of detecting and extracting a fingerprint, and then comparing that fingerprint to pre-stored fingerprint information, Dkt. No. 76 at 10-11. Although the Court agrees with Apple that "fingerprint authentication" is limited to authenticating a current user as a true user if two fingerprints match, the Court observes that fingerprint recognition is a necessary predicate for "fingerprint authentication."

The shared specification of the '373 and '419 patents explains that the user authentication process is performed upon pressing the activation button. Dkt. No. 61-3 at 7:15-17. The specification continues by describing the process that occurs after the activation button is pressed (again using iris recognition, rather than fingerprint recognition). *Id*. at 7:34-46. This process includes detection of the iris, extraction of the iris, comparison of the user's iris to pre-stored iris information, and finally authentication of the current user as the true user based on a match

10

between the user's iris and pre-stored iris information. *Id*. This entire process is described as the "user authentication process," *Id*. at 7:16, but the final step of the process is also called "authentication." *Id*. at 7:45-46.

The claim language is also instructive on the meaning of "fingerprint authentication." Claim 10 of the '419 patent recites that the device performs "a fingerprint authentication function using fingerprint recognition without additional user input." Dkt. No. 61-4 at 14:30-31. This suggests that while fingerprint recognition is not a part of the fingerprint authentication process, fingerprint recognition necessarily is performed before fingerprint authentication and its outputs are used in fingerprint authentication. Consequently, the Court construes "fingerprint authentication" to mean "process whereby current user is authenticated as a true user if the two fingerprints match."

**G.** **"in response to the one-time pressing of the activation button, the first function is performed . . ., and . . . the second function is performed when the one-time pressing is for a long time longer than a reference time period" ('373 patent claim 11)**

| Firstface's Proposed Construction | Apple's Proposed Construction | Court's Construction |
|---|---|---|
| Plain and ordinary meaning | "in response to the one-time pressing of the activation button, the first function is performed . . ., and . . . the second function is performed instead when the one-time pressing is for a long time longer than a reference time period" | Plain and ordinary meaning |

The parties' dispute over this claim stems from Apple's insertion of "instead" into the claim term. Dkt. No. 61 at 18. Firstface says that the claim term is readily understandable and requires no construction. Dkt. No. 61 at 18-19. Apple says that the claim language sets up two alternatives between a function performed with a one-time press and a function performed with a long press. Dkt. No. 69 at 22. Apple's reading of the claim would foreclose the possibility that when the activation button is pressed initially the first function occurs and as the activation continues to be pressed as a long press, the second function also occurs. *Id*. at 22.

11

Apple's proposed construction is based on a set of particular functions that Apple says would not logically make sense if both functions were performed on a long press. In Apple's hypothetical, the first function is activation of the hands free mode and the second function is playing music. *Id*. at 22-23. Apple's expert, Dr. Nieh, says that these two functions would be contradictory because music is typically paused while voice command functionality is initiated. Dkt. No. 69-1 at ¶ 47. Apple also points to several examples in the specification that set up alternative functions that are not both performed upon a long press. *See* Dkt. No. 69 at 22-23; Dkt. No. 61-3 at 8:41-61.

There is no good reason to limit the claims as Apple urges. Apple references cases where the Federal Circuit limited claims as a result of the examples in the specification even though the claim language could be read broadly, Dkt. No. 69 at 23, but those cases are readily distinguishable from the facts here. In *Biogen, Inc. v. Berlex Laboratories, Inc.*, the specification contained express language limiting the definition of the claim term. *Biogen*, 318 F.3d 1132, 1139-40 (Fed. Cir. 2003); *see also Liebel-Flarsheim Co v. Medrad, Inc.*, 358 F.3d 898, 907 (Fed. Cir. 2004) (distinguishing *Biogen* on the basis that there was no express narrowing in the specification). In *Wang Laboratories, Inc. v. America Online, Inc.*, a claim term was limited because there was evidence that the patentee was unable to implement the broader scope that would have been captured by a broader reading of the claim term. *Wang*, 197 F.3d 1377, 1382-83 (Fed. Cir. 1999). And in *O.I. Corp. v. Tekmar Co.*, the specification expressly disclaimed the scope that the patentee was trying to capture during claim construction when the specification distinguished itself from the prior art. *O.I. Corp*, 115 F.3d 1576, 1581 (Fed. Cir. 1997).

In contrast, while the specification of the '373 patent does not provide a specific example where a long press results in both the first and second function being performed, the specification also fails to provide any reason for narrowing the claim to preclude that. This is more similar to the facts of *Liebel-Flarsheim Co. v. Medrad, Inc.*, than any of the cases that Apple has cited. In *Liebel-Flarsheim*, all of the embodiments described in the specification included "pressure jackets," but the Federal Circuit nevertheless found that "the written description [did] not contain a clear disavowal of embodiments lacking a pressure jacket." *Liebel-Flarsheim*, 358 F.3d at 908.

12

1  So too here.  Although Apple has pointed to examples in the specification where a long press of
2  the activation button does not result in both the first and second functions being performed, Apple
3  has not pointed to any disavowal of that possibility.

4      Apple's reliance on the examiner's remarks in the notice of allowance for the '373 patent
5  is equally unavailing.  Although Apple contends that the examiner's remarks show that the
6  examiner understood the first and second functions were not both performed during a long press,
7  Dkt. No. 69 at 24, the examiner's remarks actually show that the examiner understood the
8  invention to be non-obvious over the prior art because it allowed the lock screen to be displayed at
9  the same time that the first function was performed.  Dkt. No. 69-5 at 5.  The examiner's remarks
10 show that the examiner understood that there were several potential first functions (*i.e.*, finger
11 authentication or activating the camera), not that the first and second functions were alternatives
12 that were not both performed upon a long press.  *Id*.  Apple also suggests that Firstface took an
13 inconsistent position on the meaning of this term before the PTAB.  Dkt. No. 130 at 2-3.  The
14 Court does not find anything inconsistent in the statements that Apple quotes in its brief.

15     The Court gives "in response to the one-time pressing of the activation button, the first
16 function is performed . . ., and . . . the second function is performed when the one-time pressing is
17 for a long time longer than a reference time period," its plain and ordinary meaning.  No further
18 construction is warranted.

H.  **"perform at least one function other than the fingerprint authentication function . . . when the one-time pressing is for a long time longer than a reference time period" ('419 patent claims 10, 12, 17)**

| Firstface's Proposed Construction | Apple's Proposed Construction | Court's Construction |
|---|---|---|
| Plain and ordinary meaning | "perform at least one function instead of the fingerprint authentication . . . when the one-time pressing is for a long time longer than a reference time period" | Plain and ordinary meaning |

26     The parties agree that this term should be construed consistently with "in response to the
27 one-time pressing of the activation button, the first function is performed . . ., and . . . the second
28 function is performed when the one-time pressing is for a long time longer than a reference time

13

period." Dkt. No. 61 at 17-19; Dkt. No. 69 at 22. Consequently, the Court also gives "perform at least one function other than the fingerprint authentication function . . . when the one-time pressing is for a long time longer than a reference time period" its plain and ordinary meaning.

**IT IS SO ORDERED.**

Dated: June 15, 2022

JAMES DONATO
United States District Judge